**Ronald BOUTET et al.**

v.

**PLANNING BOARD OF the CITY OF SACO.**

Supreme Judicial Court of Maine.

May 1, 1969.

Charles W. Smith, Roger S. Elliott, Saco, for plaintiff.

Ronald E. Ayotte, Sr., Biddeford, for defendant.

Before WILLIAMSON, C. J., and WEBBER, DUFRESNE and WEATHERBEE, JJ.

WILLIAMSON, Chief Justice.

The Planning Board of Saco refused to approve a subdivision plan for development of house lots submitted under 30 M.R.S.A. § 4956. The appeal before us is from the denial of appeal in the Superior Court.

The controversy centers about a buffer strip zone two feet in width and running between the side of a proposed street or way and neighboring land, which the appellant insists he is entitled to have approved in the plat by the Board.

The proceedings before the Planning Board and the appeal to the Superior Court were in the name of Ronald Boutet. In the Superior Court it first appeared that title to the land in the proposed subdivision was, in fact, in Barbara Boutet, the wife of Ronald Boutet. The motion of the wife to join as a party plaintiff was granted in the Superior Court over the objection of the Planning Board. It is apparent from the record that Ronald Boutet acted at all times with the full knowledge and consent of his wife and we may well consider him to have been her agent. We find neither defect in procedure nor lack of jurisdiction. The facts, in substance, are as follows:

Mr. Boutet sought to develop the area with an access road from a city street to the rear of the land for the purpose of

opening a housing development. A plan of the proposed subdivision was submitted to the Planning Board in September, 1965. A month later, by agreement, certain lots of which the title was in dispute were removed from the plan. The proposed plan called for the buffer strip as indicated for a distance of approximately 800 feet.

On October 19, 1965 (reaffirmed on October 20) the Planning Board voted unanimously that: "We notify Mr. Boutet that if he will present a revised plan that fulfills the seven points outlined as per attached letter—the Board will approve his plan." Under point 6 of the letter the Planning Board required that the buffer strip in question and also another buffer strip, with which we are not concerned, should be clearly labeled as belonging to "Boutet".

On December 15th the Planning Board adopted, after public hearing, land subdivision regulations, including Article VII—

*"General Requirements for the Subdivision of Land * * ***

B. The subdivider shall observe the following: * * *

10. Buffer zones shall not be allowed."

In April, 1966 Mr. Boutet first submitted a revised plan or plat in which he met all of the conditions for approval stated in the seven point letter of October. The Planning Board in May again reviewed the plat, and advised Mr. Boutet that the plat, with the exclusion of the buffer strip "will be approved forthwith upon its receipt by the Board. Such approval, however, as this letter of intent implies, will not be extended beyond October 30, 1966." It is from this decision that Mr. Boutet has appealed.

The statute reads in part as follows:

"30 M.R.S.A. § 4956: *Land Subdivisions.*

1. *Regulation.* A municipality may regulate the subdivision of land. * * *

C. Approval of a subdivision is based on its compliance with municipal ordinances and its general reasonableness."

■ The Board in passing upon a subdivision plat acts in an administrative capacity. It is without authority to impose conditions beyond "compliance with municipal ordinances and its general reasonableness."

"In exercising its function of approving or disapproving a subdivision plan, the planning board acts in an administrative capacity. In passing upon a plan, its action is controlled by the regulations adopted for its guidance. It has no discretion or choice but to approve a subdivision which conforms to the regulations." Langbein v. Planning Board of City of Stamford, 145 Conn. 674, 146 A. 2d 412, 414, (1958).

See also Forest Construction Co. v. Planning & Zoning Com'n, 155 Conn. 669, 236 A.2d 917 (1967).

We turn later to consideration of the regulation adopted by the Planning Board.

Mr. Boutet vigorously contends that the Board conditionally approved the plat with the buffer strip in October, 1965 and that therefore on compliance with the conditions in April, 1966 he was entitled as a matter of law to approval by the Board. There is nothing, however, in the record to establish that either by ordinance or regulation the Planning Board in October, 1965 was authorized to grant a conditional approval of a plat giving to the developer settled rights to approval on compliance.

By statute or regulation provision is sometimes made for what has been called a two-step process of subdivision plat approval involving tentative approval to be followed by final approval.

In Pennyton Homes, Inc. v. Planning Bd. of Stanhope, 41 N.J. 578, 197 A.2d 870, 872 (1964) the court in commenting on the original planning act said:

"There was no provision for the current two-step process of tentative and final

plat approval. 'Approval' was a single act, final in nature, (except perhaps in one limited situation, see R.S. 40:55–19) and there was no problem of protection to a developer by reason of any preliminary or tentative approval."

In Levin v. Livingston Tp., 35 N.J. 500, 173 A.2d 391, 397 (1961) the court said:

"So the general revision of the planning act in 1953 introduced for the first time a two-step approval procedure, permitting municipalities to provide for 'tentative approval' of plats, N.J.S.A. 40:55–1.-18, by which these basic matters may be settled. From what has been said, it is obvious that tentative approval is the most importatnt phase of the subdivision regulation process."

See also Hilton Acres v. Klein, 35 N.J. 570, 174 A.2d 465, 470 (1961); 3 American Law of Zoning (Anderson), (1968) § 19.13 "Preliminary and final plats; tentative approval"; § 19.19 "Subdivision regulations"; 2 Zoning Law and Practice (Yokley) (1965) § 12–7.

■ The two-step process, useful as it doubtless is to developer and Planning Board, in our view rests on the statutes or regulations authorized thereunder. Here we find no foundation for a conditional approval in October, 1965.

■ The action of the Board in October, 1965 thus gave no rights whatsoever to the landowner to compel final approval on compliance with the conditions. In reaching this conclusion we do not accept the argument of the defendant that the Board did not, in fact, give a tentative approval. We think the intention of the Board in October was clear. We are saying that the Board simply did not have authority to make such a commitment.

■ The landowner gains nothing in this instance on the basis of an estoppel against the Planning Board and City. Assuming that under certain circumstances a landowner may acquire rights by estoppel

he has not done so on the facts of this case. At most between October, 1965 and April or May, 1966 the landowner did no more than take down a barn, which was an action not directly attributable to the location of the buffer strip, obtain a variance of the zoning ordinance with reference to lot sizes which would have been required apart from the issue of the buffer strip, and spend some $30 or $40 in obtaining a new plan. This is not sufficient change in his situation to claim that justice requires that the Planning Board and City are to be bound by the tentative approval in October, 1966. See Levin v. Livingston Tp., supra, 173 A. at p. 402; Tremarco Corp. v. Garzio, 32 N.J. 448, 161 A.2d 241, 245 (1960); Municipal Law (Rhyne) p. 893 (1957).

The question then becomes whether the subdivision plat submitted in April, 1966 met the requirements of the ordinances of Saco and the general reasonableness test. If so, the landowner was entitled without more to approval by the Board.

■ In our view the rule against a buffer strip or zone was proper under the "general reasonableness" provision of the statute. The Legislature intended that there should be room for exercise of discretion by the Planning Board. If the ordinances alone bounded the field of its authority the words "general reasonableness" would have no meaning.

The regulation by the Planning Board was properly adopted as part of a comprehensive plan for the city of Saco. 30 M. R.S.A. § 4952 relating to planning boards reads in part:

"2. *Plans.* The board shall prepare, adopt and may amend a comprehensive plan containing its recommendations for the development of the municipality.

A. Among other things, the plan may include the proposed general character, location, use, construction, layout, extent, size, open spaces and population density of all real estate, and the proposed method for rehabilitating blighted districts and eliminating slum areas.

B. The board shall hold a public hearing on its tentative proposals, before it adopts the plan or an amendment of it.

C. Once adopted by the board, the plan becomes a public record. It shall be filed in the office of the clerk."

The Board, therefore, in May had before it the policy against approval of buffer zones found in the regulations. The test, however, remains one of reasonableness. If the policy of the Board, whether by regulation or otherwise, does not lie within the test of reasonableness, it must fail and cannot be used as a measure of disapproval by the Board.

■   On the record before us we are unable to say that the exclusion of buffer zones as a matter of law is not reasonable. The reasons against the approval of buffer zones in subdivision plats were persuasively set forth by the Chairman of the Planning Board in the adoption of the subdivision regulation in December, 1965. He testified in part as follows:

"I investigated the treatment of buffer strips in subdivisions and by other Planning Boards and by other planners in Maine. I consulted Mr. Klunder who is our planning consultant for the City. I consulted certain legal, got certain legal opinion about this. And in no place could I find where buffer strips, as such, were an approved device in a subdivision plotting. Further than this, from a point of view of the land involved, it meant that the Board, if they should approve a buffer strip here, would be approving a strip some seven hundred odd feet long on one side of the property, which was then, if you project to what is normal in a final disposition of subdivisions, that a street would then be asked to be approved by the City. And then the subdivider would have to be asking the City, in effect, to approve half a street. That is, they would be approving a street which would only have taxable land on it one side, when it would be possible to have taxable land opened up to it on the other side, as well. So that you have the problem of maintenance. You have the problem of development which is the, for the best of the community, which should be so they could be opened up on both sides. I could find no technical way in which this could be done and still grant Mr. Boutet a buffer strip without just having removed it from the plan. We tried very hard, or I tried very hard, certainly, to find a method in which we could grant this. And I don't want to get into areas where I am giving other people's opinions. But I find it is very difficult to. Because, obviously, I had to go to  *  *  *  and in this case I was acting for the Board—to other sources for our information concerning the use of buffer strips. The only time that I could find that a buffer strip was approved by planners in subdivisions, or at any place, is when it is used for a public use. This is where it would be in the form—"

*The COURT:* In other words, the adjoining land is devoted to public purposes?

*The WITNESS:*  *  *  *  When it is, for example, in a playground or a park, or something similar to that, they sometime, when it is a public use, will provide a buffer strip. Other than that, I could find no instances where buffer strips was an approved device to be used in a subdivision—excuse me—subdivision regulation, or in a subdivision approval. We become sophisticated in our treatment, or in our consideration of these problems the longer that we get into things, and the more we have experience on them. We certainly, and I certainly know much more about buffer strips today than I did a year ago, and much more a year ago than I did two years ago. So that our information is constantly, and our knowledge is constantly growing on these things. This is one reason, I think, why our subdivision regulation lay on the table so long, because

we had had it presented to us by our first comprehensive planner back in 19——.

* * * I will say that I had several opinions, professional opinions as regards to buffer strip. None of them indicated that such should be approved.

* * * The basis used for approving plats at the present time is a subdivision regulation which we have adopted as of December 15, 1965.

Q—And you are familiar with the statutory provision with regard the basis to be used?

A—Yes.

Q—And what is that basis?

A—That is on the basis of the compliance with the ordinances, and of general reasonableness.

It is argued that if the buffer strip was reasonable in October, 1965 it therefore as a matter of law must be considered reasonable in May, 1966. This argument does not take into consideration that after public hearing, the Board in December, 1965 adopted the policy against buffer strips. No guarantee was given or could have been given that a buffer strip reasonable in October would be reasonable in May. Under the view of the landowner progress in the development of regulation and control of land subdivisions would be at a standstill.

 Furthermore, the fact that in both October and May the Planning Board appears to have approved a second buffer strip in the subdivision has no bearing upon the refusal to approve the strip in issue. We need not determine whether the second buffer strip lawfully could have been approved. It is sufficient for our purpose that the plat with the buffer strip in issue was not approved.

If Mr. Boutet had first applied in May, 1966 he would have been faced with a policy cast in the form of a subdivision regulation against his desired two-foot buffer strip approximately 800 feet in length. In effect, he is asking the Planning Board and the Courts on appeal that the tentative approval based on conditions which he met ripened into a final approval in May. It is the two-step process which he seeks to utilize and which is not available to him. We find no error in the decision of the Superior Court upholding the failure of the Planning Board to approve the subdivision plat on the ground that there was not compliance with the "general reasonableness" provision of the statute.

The entry will be:

Appeal denied.

TAPLEY and MARDEN, JJ., did not participate.